UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-13539-RGS

JOHN HANCOCK LIFE INSURANCE COMPANY (USA);
JOHN HANCOCK DISTRIBUTORS, LLC;
SIGNATOR INSURANCE AGENCY, INC.; and
SIGNATOR INVESTORS, INC.

v.

STEVEN C. LEISHER and
POTOMAC GROUP WEST, INC.

MEMORANDUM AND ORDER ON THE ENFORCEABILITY OF
THE PARTIES' SETTLEMENT AGREEMENT

April 11, 2016

STEARNS, D.J.

This is a case of belated onset of buyer's remorse.  On one side are plaintiffs John Hancock Life Insurance Company (USA); John Hancock Distributors, LLC; Signator Insurance Agency, Inc.; and Signator Investors, Inc. (collectively John Hancock).  On the other are defendants Steven C. Leisher and Potomac Group West, Inc. (collectively Leisher).  At issue is whether the parties are bound by a settlement agreement purportedly to resolve Leisher's unpaid commissions claim.  After a review of the documentary record and for the reasons to be explained, I find that the parties are bound by their agreement of February 19, 2015.

Leisher was a general agent for high-value life insurance products underwritten by John Hancock or its predecessors beginning as early as 1998. John Hancock terminated Leisher in 2007. Following his termination, Leisher claimed that John Hancock had underpaid his commissions in the amount of $413,000. In 2012, Leisher initiated proceedings with the American Arbitration Association (AAA) as required by the mandatory arbitration provision of his general agent contracts. In January of 2015, the parties participated in an unsuccessful mediation before Judge Robert Morrill (ret.). Following the mediation effort, Judge Morrill convened a "Yankee Auction," and separately proposed a settlement figure of $300,000 to the parties. Both parties accepted.

In February of 2015, the parties exchanged several rounds of email negotiations over the terms of a settlement agreement, but did not execute the agreement in writing. Leisher contends that no "meeting of the minds" was reached among the parties on the material terms of the agreement and asked the AAA to proceed with the arbitration. In October of 2015, John Hancock filed this lawsuit to enjoin the arbitration and to enforce the settlement. Leisher moved to dismiss the Complaint or to stay and compel arbitration, citing to the arbitration provision of his general agent contracts. John Hancock, for its part, contends that the parties agreed on the settlement

terms on February 19, 2015, and that the settlement agreement did not by its terms mandate arbitration. Pursuant to Fed. R. Civ. P. 12(d), the court converted Leisher's motion to dismiss to one for summary judgment on "[t]he pivotal factual question [of] whether the settlement agreement was validly executed and therefore binding." Dkt. # 20. After a period of focused discovery, the parties filed supplemental briefs with supporting exhibits.

## DISCUSSION

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A settlement agreement is a contract and its enforceability is determined by applying general contract law." *Sparrow v. Demonico*, 461 Mass. 322, 327 (2012).[1] "[I]n Massachusetts an enforceable settlement agreement arises when the parties to be bound mutually assent to all material terms, even if those terms are not memorialized in a final writing." *Hansen v. Rhode Island's Only 24 Hour Truck & Auto Plaza, Inc.*, 962 F. Supp. 2d 311, 314 (D. Mass. 2013); *see also Targus Grp. Int'l, Inc. v. Sherman*, 76 Mass. App. Ct. 421, 428 (2010) ("An enforceable agreement requires (1) terms sufficiently complete and definite,

---

[1] The parties do not dispute that Massachusetts law governs this dispute.

3

and (2) a present intent of the parties at the time of formation to be bound by those terms.").

Leisher contends that the settlement is not binding "because the only material term agreed upon [by the parties] was 'price,'" Defs.' Suppl. Br. at 6; the parties did not evince the requisite intent to be bound, *id.* at 10-11; and the terms of any settlement were not sufficiently defined to be enforceable, *id.* at 12. The documentary record, however, contradicts these assertions. The parties resolved all material disputes and mutually assented to the third draft agreement on February 19, 2015.

The essential background is as follows. Negotiations opened on February 8, 2015, when Darren Goldstein, the attorney for John Hancock, emailed a first draft of the settlement agreement to Don Christie and George Field, the attorneys for Leisher. *See* Pls.' Exs. A, B. The 7-page first draft included 24 paragraphs outlining the terms. Notably, paragraph 2 provided for the payment by John Hancock to Leisher of $300,000. Paragraphs 4 and 5 provided for a mutual general release of all claims "from the beginning of time through the date of this Agreement, except claims arising from a breach of this Agreement." Pls.' Ex. B. at 2-3. The Agreement did not contain an arbitration clause.

The following day, Christie objected that

> [t]he draft agreement does not address policies on which [Leisher] is currently receiving commissions or commissions, if any, on the remaining Corry policies which [Leisher] claims are due to him.  I think the easiest way to handle this is to have an exhibit with the list of policies still in place and a provision that commissions due on those policies shall not be affected by the release.

Pls.' Ex. C.  Goldstein replied noting "[his] understanding [] that the release is a general release and no other payments in addition to the $300,000 will be made."  Christie Aff. Ex. 4.  Christie responded with an email stating that "if [Goldstein's] interpretation is correct, then there was never a meeting of the minds and [they] should notify Judge Morrill that there is no settlement."  Christie Aff. Ex. 5.  Christie then informed Judge Morrill of the dispute, and told him that "the settlement is, at best, on hold."  Christie Aff. Ex. 6.

Several hours later, Goldstein reported back to Christie and Field that "[his] client [was] willing to pay the on-going commissions so long as [they] can agree on specifically which commissions will be paid."  Pls.' Ex. E.  Christie responded by reiterating his "suggestion [] to prepare an exhibit with a list of policies on which commissions will continue to be paid. . . . [He] also suggest[ed] that the check request be submitted now so [they] can exchange the executed agreement for the check."  Pls.' Ex. F.  On February 18, 2015, Goldstein emailed a second draft agreement to Christie and Field.  Pls.' Exs. G, H.  Paragraph 2 of the second draft now characterized the

$300,000 as an "[i]nitial payment," and added a subpart B regarding "Renewal Commission Payments" that read:

> With respect only to the policies listed on Exhibit A hereto, [John Hancock] will pay to [] Leisher renewal commissions to the extent payable, and in the time periods specified, under the terms of the August 2005 General Agent and Broker-Dealer Selling Agreement.

Pls.' Ex. H at 2. The second draft added an Exhibit A listing 56 policies by number. *Id.* at Ex. A.

Christie acknowledged that "[he thought they] were very close," but raised three additional issues. Pls.' Ex. I. Because "some of the commissions might arise under the Contract between [Leisher] and Old Hancock which was not merged into USA until 2009," he proposed that Paragraph 2B state that Leisher would be paid renewal commissions "as provided by the contracts between the Parties in effect the day prior to the termination of those contracts by the JH Parties." *Id.* Christie also proposed to insert language that "[n]otwithstanding anything to the contrary contained herein, the JH Parties shall not be released from their duty to make ongoing payments as provided in Section 2.B above." *Id.* Finally, he inquired specifically into the status of four Corry policies not listed on Exhibit A. *Id.* "Assuming [they could] get the changed made by tomorrow, [Christie was] confident that [they could] exchange executed copies by [] Friday." *Id.*

6

On the following day, Goldstein submitted a third draft agreement to Christie and Field. Pls.' Exs. J, K, L. Goldstein pointed out that

> [he] revised paragraph 2(B) to take account of what [he] believe was [Christie's] legitimate concern but [he] expressed it a little bit differently. . . .
>
> [He] did not make [Christie's] suggested change to the end of paragraph 4 [(the general release provision)] because that paragraph already excepts "claims arising from a breach of this Agreement."

Pls.' Ex. J. Goldstein also explained that the non-inclusion of the Corry policies on Exhibit A was because "no further renewal commissions [were] payable under those policies." *Id.* Paragraph 2B of the third draft of the agreement now read:

> With respect only to the policies listed on Exhibit A hereto, [John Hancock] will pay to [] Leisher renewal commissions coming due after the date of this Settlement Agreement to the extent payable, and in the time periods specified, under the terms of the contracts in effect on March 22, 2007.

Pls.' Ex. L at 2. Christie replied:

> Thank you for the revisions *which are accepted* and the explanation on the remaining Corry policy. Once Mr. Leisher's staff does a final review of the policies listed in Exhibit A the agreement will be executed and Exhibit A initialed.

Pls.' Ex. M (emphasis added). It is clear from the entire exchange that Christie's February 19, 2015 email expressed Leisher's "present intent" to

accept not only the $300,000 initial payment, but all of the terms of the third draft agreement.

Leisher next asserts that the contents of Exhibit A, which he maintains is one of the material terms, was never fully completed by the parties. Leisher recounts that he attempted to work in good faith with John Hancock to resolve the issue of the ongoing policies. However, "the information given by the Hancock entities was never sufficient to show that all amounts owed by the Hancock entities had been paid." Defs.' Suppl. Br. at 9. The "breaking point" came in September of 2015, when Leisher allegedly learned that John Hancock had failed to pay him $197,771.18 in commissions on the Honstein policy listed on Exhibit A.[2]  *Id.* at 10.

This belated revelation, however, does not serve to create a genuine dispute over the contents of Exhibit A. The parties agreed during the February negotiations that Exhibit A would list the policies on which Leisher would be entitled to future renewal commissions.  *See* Pls.' Ex. F. Defendants' complaint is not that policies eligible for future renewal commissions were deliberately omitted from Exhibit A, but that in the course of verifying the Exhibit, they uncovered additional unpaid past commissions.

---

[2] The Honstein policy was listed on Exhibit A attached to both the second and third draft agreements.

Although the new information understandably gave rise to a case of regret that Leisher had perhaps settled his past commissions claim on the cheap, it remains that Leisher assented to release all claims against John Hancock "from the beginning of time through the date of this Agreement, except claims arising from a breach of this Agreement." Pls.' Ex. L at 3. "As the trial judge observed . . . [defendant] could have and should have investigated the data to its satisfaction before its agreement to end the trial. If [defendant] had remained genuinely suspicious, it could have declined that settlement term or the settlement altogether." *Basis Tech. Corp. v. Amazon.com, Inc.*, 71 Mass. App. Ct. 29, 39 (2008).[3]

Finally, Leisher suggests that the settlement is not enforceable because it was never validly executed. "It is elementary law that an offer must be accepted in the terms in which it is made in order to become a binding contract." *Moss v. Old Colony Trust Co.*, 246 Mass. 139, 148 (1923). "If the

---

[3] Even were the parties to disagree over the inclusiveness of Exhibit A, the dispute would not impugn the enforceability of the settlement agreement as a whole. "If parties specify formulae and procedures that, although contingent on future events, provide mechanisms to narrow present uncertainties to rights and obligations, their agreement is binding." *Basis Tech*, 71 Mass. App. Ct. at 39. Here, the parties agreed on the objective criteria – the ongoing policies on which Leisher would be entitled to future renewal commissions under his most recent contracts – that would determine the contents of Exhibit A.

offeror sets out an exclusive method for acceptance the acceptance *must* be made in that manner." *Host v. Gray,* 2013 WL 1319609, at *3 (Mass. Land Ct. Apr. 2, 2013), *aff'd,* 85 Mass. App. Ct. 1110 (2014) (emphasis in original). Leisher contends that the inclusion of a signature block on each version of the draft agreement indicates that execution was the only method of acceptance. However, nothing in the record indicates that John Hancock made its offer contingent on this specific manner of acceptance. "If [] the parties have agreed upon all material terms, it may be inferred that the purpose of a final document which the parties agree to execute is to serve as a polished memorandum of an already binding contract." *McCarthy v. Tobin*, 429 Mass. 84, 87 (1999), quoting *Goren v. Royal Invs., Inc.*, 25 Mass. App. Ct. 137, 140 (1987). The addition of a signature block is a useful formality, but not a prerequisite for the enforceability of an otherwise agreed upon contract.

ORDER

For the foregoing reasons, defendants' motion to dismiss the Complaint or to stay and compel arbitration is DENIED. The court ALLOWS summary judgment for plaintiffs[4] on Count I of their Complaint and

---

[4] "[D]istrict courts have the power to grant summary judgment sua sponte" when "no material facts are in dispute and that the undisputed facts

<u>DECLARES</u> that the February 19, 2015 third draft agreement is binding and enforceable as of that date.[5]  The parties will, within fourteen days of this Order, file a joint statement as to whether and how they intend to proceed on Counts II (breach of contract) and III (breach of the covenant of good faith and fair dealing) of the Complaint.[6]

                        SO ORDERED.

                        /s/ Richard G. Stearns
                        _____
                        UNITED STATES DISTRICT JUDGE

---

entitle one of the parties to judgment as a matter of law." *Berkovitz v. Home Box Office, Inc.*, 89 F.3d 24, 29 (1st Cir. 1996).

    [5] The renewal commissions contemplated by paragraph 2B are also to be determined as of February 19, 2015.

    [6] John Hancock alleges in the Complaint that Leisher has "failed and refused to comply with the terms of the Settlement Agreement."  Compl. ¶ 52.  However, under the agreement, Leisher's obligations to release past claims and to dismiss the AAA proceeding are only triggered by the payment by John Hancock of the initial $300,000 under paragraph 2A.  *See* Pls.' Ex. L at 2 (general release is "[e]ffective upon receipt by the Leisher parties of the Settlement Payment set forth in Paragraph 2(A)"), 4 (dismissal of arbitration "[w]ithin three (3) business days of receipt by the Leisher Parties of the Settlement Payment").  Leisher avers that "[John Hancock has] refuse[d] to make any settlement payment without a signed agreement." Defs.' Suppl. Br. at 4.